3-19-0185 Juan Jamie and the Three Brothers Investments, LLC, et al. Appearance by Shabir Nomanbhoy, et al., athlete. Thank you. Good morning. Good morning. Good morning. Good morning. We're going to ask that you introduce yourselves when you get ready to speak. Welcome to the Zoom court call. Let me see. Mr. Urban? Yes, good morning. Good morning. Would you like to start? Yes. I'm sorry. I momentarily lost my screen. I was trying to find it, but now I found it. Good morning, Justices. My name is John Urban. I'm the appellant. I'm the attorney for the appellant, rather. Okay. All right. You missed your argument. Oh, I'm sorry. So, it is the position of the appellant, Juan Jamie, that all the facts in the case stand for two basic propositions. Number one, Mr. Nomanbhoy is not credible, and secondly, that everything that happened was designed from the very beginning to keep Mr. Jaime from exercising the option agreement. From the very beginning, even before the contracts were signed, Mr. Nomanbhoy was given various documents, including an appraisal. The appraisal had a rent roll in it, which indicated that Mr. Jaime was only paying, or his corporations, were only paying about a thousand dollars per month for each of the two tenants. And it also indicated that none of the tenants were paying additional rent. In that email, Mr. Nomanbhoy was Juan Jaime was only paying a thousand dollars a month for each of his two tenants, and if that was the case, he would probably not even break even during the holding period that he was going to hold the property until the option was being exercised. Mr. Nomanbhoy recognized that he could not ask, or that Mr. Jaime probably was not going to be able to pay four thousand dollars a month that was a negotiation whereby the two tenants that were partially owned by Mr. Nomanbhoy, by Mr. Jaime, would pay two thousand dollars a month. In that email, Mr. Nomanbhoy recognized that the additional rent, a component of which was the property taxes, were being paid out of the rent that was being collected, and that at a thousand dollars a month he would not be able to, or be hard to break even. So it was increased. So I asked you a question with regard to background information. Who drafted, who was the attorney that drafted the sales agreement, the option agreement? The option agreement, I believe, was done by Mr. Portlock, the attorney for Mr. Jaime. It was based off of a option proposals that Mr. Nomanbhoy had given to Mr. Jaime and Mr. Portlock. So the that email recognized, first of all, that showed up in front of mine. I'm sorry, Justice. Go ahead. So that email recognized that additional rent was not being paid, and that Mr. Jaime could probably ill afford paying much more than what he was being required to pay. According to Mr. Jaime and Mr. Portlock, there was no discussion of payment of additional rent until after the contracts were signed. And actually it was the day after the contracts were signed that Mr. Nomanbhoy caused notices to be sent to all the tenants that they had to pay additional rent. So Mr. Jaime's two corporations, instead of paying a thousand dollars that they were before, he was now paying two thousand dollars that he had agreed to under the belief that he did not have, the corporations did not have to pay additional rent. But additionally, one corporation had to pay an additional sixteen hundred dollars a month in rent and an additional one thousand eight hundred and ten dollars for the other tenant. So this was more than he had anticipated. We believe that this indicates a mistake on the part of Mr. Jaime. He did not believe that he was going to be paying this. He was not notified of this and it had been long established that his tenants were not paying it. So we believe that also indicates a deceit on Mr. Nomanbhoy. He knew that Mr. Jaime could ill afford additional amounts of money. Yet he was able to get an additional thousand and also started trying to collect additional rent. Did Mr. Nomanbhoy know that the other tenants were not paying the triple net amounts? A review of the rent roll would indicate that they were not paying the additional rent. My question was did Mr. Nomanbhoy know that? Was he advised? I believe Mr. Nomanbhoy's testimony was that he did not know it. But that does not coincide with his email prior to the closing, nor does it nor is it in compliance with the fact that the rent roll in the appraisal indicated that they weren't paying the additional rent. Mr. Nomanbhoy was a well-educated individual, had a master's degree in business, and one would believe that he would look at all the documents available to him in order to determine if there was additional rent being paid. Well the plaintiff actually told the tenants not to pay the additional rents, correct? That was after the notices were sent out, correct? He told them because he believed that there was no grounds for it, because it had never been paid before and it wasn't part of the negotiations that they pay. The two options agreements that Nomanbhoy submitted to Jaime prior to the entry into the agreements provided that Nomanbhoy was going to pay for the 2013 taxes and also the 2014 taxes. So it would mean that there would be no additional rent. So there was a subsequent agreement entered in September, an addendum to the lease agreements that provided that the tenants and also Mr. Jaime's two corporations would pay additional rent for the real estate taxes for the year 2014, left the year 2013 out. At the trial, Mr. Nomanbhoy admitted that the written document did not provide for the 2013 additional taxes to be paid by them. Yet Mr. Nomanbhoy collected for it and there's at least $68,000 that he required the tenants to pay as additional rent, which was not allowed under any of the written documents. Now when when your client leased to the businesses, I mean the one space to a third party, to third parties at an increased amount and kept that money, what was the dynamic behind that without telling the other side? So, Mr. Jaime doesn't have that great of extent of education. He had signed a document indicating that he was going to exercise the option. About 15 months later, it was probably his belief that he had a say in the property more than perhaps the written documents provided. I mean, because a lot of what you're talking about are, it seems to be unilateral understandings, not not understandings with the contracting parties, right? It's just like what your client just believed. Is that right? The contract provided that for the non-assignability of leases without the approval of the landlord, but there was an assignment of leases. The amount of money which Mr. Jaime collected from the leases was about $276,000. Most of that money was used to pay the rent to Mr. Nomenboy. I don't know that it can be characterized as pocketing it. Mr. Jaime all of a sudden had to pay additional money that he had not known beforehand that he had to pay. We believe that Mr. Nomenboy had the intent from... I'm sorry? Was Mr. Jaime represented by council the entire time? I don't believe he was represented at the closing. He was represented for a time during the discussion of additional rent. Was he represented at the time that they entered into the agreement? The addendum agreement. Both the original option and the addendum. The original option he was represented by an attorney and that original option agreement provided all he had to do was give certain notice and pay $50,000 by a certain time. He was represented by an attorney for that. For the subsequent addendum, he was not represented by an attorney and this addendum provided not only for additional rent, but also for all these other items including the payment of additional rent in certain other matters. So he was not represented then to my knowledge. When you say your client doesn't understand things, at the same time he's advising these other people not to pay and making interpretations of what he believes his individual understanding of the contractual obligations are. Isn't that where he's telling other people not to do things? Then he's taking additional monies and keeping it himself, correct? So he's in a situation that is basically what took place except for the fact that I don't believe you can characterize it that he was for the most part was used to pay the rent to Noman Boy and to pay the additional rent that was not required, that should not have been paid. And in matter of fact, in regards to telling his tenants he didn't have to pay, they were all up in arms about this. There's evidence in the record that the tenants were going to go somewhere else. Mr. Jaime knew that he could not get the property back to get a loan for it when the time came up in 15 months if all the tenants were gone. There would be no income stream. He would not be able to get a loan. So he had an interest in protecting the shopping center not only for himself but also for Mr. Noman Boy. Because if the tenants left that would hurt Mr. Noman Boy. So he had a duty to himself to ensure he had some particular standing in this because he had an interest that he was trying to protect. But this was all unbeknownst to the defendant, correct? I'm not sure what to what you're referring, your honor. Well these additional leases that happened and the collections of the amounts of money and so forth. The defendant wasn't aware of all of this. It wasn't the defendant. I don't believe the record indicates that, your honor. And was Mr. Jaime representing to the tenants, the other tenants, that he was in fact the landlord? I believe there's testimony to that effect by a few of the witnesses. So first of all we believe that the evidence shows that Mr. Noman Boy determined from the very beginning that he wasn't going to allow the contract, the option to be exercised. And that would void the contract, rescind it, and take away everything that happened after that. Now in regards to the judgment, the damages, there's no support in the record for any  The court found that Jaime committed misconduct by failing to return security deposits. Yet this, like the other items, there's no support in the record that Mr. Jaime had to return the security deposits. The options and the leases all required that the security deposits be returned when the tenant vacated or the lease was terminated. These tenants, all but one, were still in existence. So any judgment for that amount is against the manifested weight of the evidence. In regards to fraudulent leases, there's no evidence what the amount is or what the amount of damages is. No evidence. As a matter of fact, it was Mr. Noman Boy that terminated one of those individuals after they had only paid $76,000 because he wanted more rent. So he evicted that tenant. Yet Mr. Noman Boy is asking for the balance of the period of time that that individual was gone. Mr. Noman Boy asked for rent, additional rent, for Super Mercado, which they had vacated. They were no longer there. And he was president in court when it happened. And I apologize, I have a lot more to say, but my time is up. Thank you very much. I believe my time is up. I think that's a yes, that's correct. All right, thank you. Mr. Khan, you may proceed. Good morning, my name is Zubair Khan, representing the appellee in this matter. Justices, thank you for the time. May it please the court. This case was litigated for 10 days over many months. In the end, the trial court saw that my client, Shabir Noman Boy, negotiated in good faith, complied with the agreements, and ultimately was able to discover the the appellant's misconduct and breach of the option agreement. The trial court noted emphatically that Mr. Juan Jaime's explanations as to what occurred and why the agreements should be ignored were, quote, were not credible, and that his attempts to portray himself as a simple-minded, uneducated person were, quote, disingenuous. Ultimately, his actions breached the option agreement, thereby terminating his right to exercise the option to buy back the strip mall. His actions were fraudulent and, quote, a series of very obvious breaches of fiduciary duty. I'm not going to go through all of the facts that Mr. Urban has already gone through. I'll try to point out those that I believe are relevant here to our discussion. This involved a strip mall on Ohio Street in Joliet, Illinois. There he had built this himself. There was a foreclosure sale set for June 19, 2014. That is how Mr. Nomenboy got involved in this from the very beginning through a common friend, Daryl Tom. Mr. Nomenboy, the evidence showed, reviewed the leases that were given to him by Mr. Jaime's attorney, Mr. Portlock, and he reviewed the appraisal. He noted that the leases were triple net and that thereby meaning that that they would require the payment of CAM insurance and real estate taxes through the by the tenants. Negotiations took place over the course of a month or so. There were many different factors. In the end, Nomenboy suggested a buyback. The reasons for that suggestion, he did not want to loan the money. He believed that there was a benefit to him, a business benefit of a profit of buying this for $800,000 and the value of this, sorry, selling this property was, and the appraisal was $1.1, and he knew that he could collect rent from a manager who was motivated to have the rent in proper shape because he was scheduled for a buyback. Nomenboy was new to this, to commercial properties, and he saw that as an opportunity to learn and he was an out of, he was an out-of-town landlord, so there was a benefit of having Mr. Jaime there as the manager. Agreements were drafted. Mr. Portlock represented Mr. Jaime. The main important provisions that were specifically mentioned by Mr. Nomenboy in his notes prior to them being put into an agreement were that there would be two, the two anchor tenants, which were still owned, which were owned by Mr. Jaime, would have additional rent. The term additional rent is literally in there as it is in all the leases that were, that were given by Mr. Portlock to Mr. Nomenboy. The non-assignability clause was particularly important to those two tenants, the reason being is because they were getting, they were given a special price, a price that was lower, that was lower than all the other tenants, significantly lower, $2.40 per square foot versus $24 per square foot, so it was very important to Mr. Nomenboy that if for some reason a new tenant were to come and that the only Mr. Jaime would get the benefit of that low rate because he was scheduled to buy back the the mall and because he was serving as the manager, so that was very important to Mr. Nomenboy. Was he a fiduciary in that role? As your, your honor, you're saying as a judge that Illinois has recognized that managers of properties are fiduciary, fiduciaries of the owners and I think it's not just as a, as a legal distinction, you know, as a, as a legal category but also the facts themselves, given the fact that Mr. Mr. Jaime was the one kind of on the ground more at that time, my client being somebody who lives in California and that he had the relationships with the tenants and that he was assigned to keep their security deposits and to handle any maintenance that during that period we, I believe that, that that did establish a fiduciary duty as a manager at that time. So, so at this point there's the closing, the closing occurs, the appellant's attorney puts together all of the agreements, there's a sales contract, there's an option agreement and there's two new leases for the new tenants with addendums to those two new leases as well. After the closing, almost immediately the dispute regarding the additional rent begins. Around, it was June 17th after the closing, where for the first time Mr. Jaime's attorney, Mr. Portlock informed Mr. Nomenboy that the additional rent had never been collected before that. That was the first time and that's what the testimony said from Mr. Nomenboy and then at that point Mr. Nomenboy sent the letters to all the tenants saying this will be your additional rent and calculating it for them. During that time, we've discussed already that Mr. Nomenboy, I'm sorry, Mr. Jaime informed his tenants that they did not need to pay the additional rent despite the fact that it was clearly in the leases. He himself, Mr. Nomenboy, through his two anchor tenants, he didn't pay the additional rent and this lasted for a long time. It wasn't just a one-day affair. He didn't pay in June. He didn't pay in July and then really the negotiations of trying to get this moving to try to resolve the issue didn't occur until August. By that time, there's already three months of additional rent that hadn't been paid. My client submitted eviction notices in mid-July. He did not execute on those eviction notices. Ultimately, what happens is this leads to the September addendums being negotiated. Multiple conference calls in July and multiple drafts of the September addendum and the September addendum was a valid contract that served to modify the current agreements that were closed in May of 2004. Specifically, my client waived his right to evict based on the prior leases by allowing Mr. Jaime to pay for his unpaid balance on the additional rent. He waived his right to evict at that point. At that point, the purpose of the addendum was to kind of settle this additional rent issue and make it clear that a breach of the appellant's leases would also constitute a violation of the option agreement. After that was entered in September, now unbeknownst to my client, during this negotiation, throughout the whole time, Mr. Jaime was actually leasing both of his units, the anchor tenants, to third parties. My client did not know about this until in the middle of the litigation in the trial court. Specifically, he was renting out the banquet hall to a Mr. Jasso, falsely telling him that he was the owner and collecting three times the rent that he was required, the base rent, that he was required to pay to Mr. Jaime. Similarly to the supermercado, the other anchor tenant, he was paying Ali Shalash, or sorry, Ali Shalash was the name of the tenant, who was paying $4,000 a month. Again, $2,000 more than the actual money that he was paying to Mr. Nomenboy. Now, during this litigation, even more came out, that the banquet hall had then been subsequently leased to another person named Amber Duffy for $6,500. Compare that to the $2,000 that he was paying. And this was done, again, by telling Mrs. Duffy that he was the owner. And on top of that, because this was done without, you know, kind of done without telling my client, he, when Mr. Nomenboy finally approached Mr. Duffy, Mrs. Duffy herself at the trial court testified that he was told that Nomenboy was a crazy man. And in fact, when she ultimately couldn't pay her rent to to Mr. Jaime, she is evicted without any eviction procedure, just a self-help type of way, because that's how Mr. Jaime had to do it, to keep it secret. He just locked her up, and that's what she testified to. Ultimately, again, none of this was known during the time of the, you know, until the litigation. In February 2015, once again, disputes arise regarding the additional rent, because again, that's all my client knew at the time. And there was a disputed amount of what was owed at that point, but no amount was even paid by Mr. Jaime. So, you know, there was a little less than $10,000 that was in dispute, but none, no amounts was paid. My client refused to honor the option at that point, and this lawsuit was then filed. How did you get to the, how did the trial judge get to the $917,000 plus amount? So the $917,000 amount, it, because this, the trial court's judgment, I guess, came in two sections. There was the initial judgment in November 13th, on November 13th, where the judge found damages on the breach of contract claim, damages on the fraud claim, and the fiduciary duty claim. What the judge did was he realized that some of these were fraudulent, and by the time the motions to reconsider were filed, the judge removed the damages on the breach of contract, because they, he considered them to be duplicative. He still believed there was a breach of contract. It wasn't, these weren't nominal damages, he just decided that there was no need to go into that because it was duplicative of the fraudulent, the fraud claim and the fiduciary duty claim. Now, as to the fraud claim, that's a 708? Well, the total amount that, after the motion to reconsider, the total amount was the $917,000 and $1754,000. Exactly, $917,000, $1754,000. How the judge came to that was specifically, the largest component of that was the $708,000 of damages under the, what I've termed as the fraudulent leases, those leases that the judge determined were rightfully caused by the fraud, meaning that the damages calculation is what will put Mr. Nomenboy in the place he would have been, he would have, he would not have been, oh sorry, he would have been absent the fraud. But when that amount was determined, the 708, there was a deduction of the rent that was actually paid to your client? Yes, yes, there was a deduction because remember, none of those items were actually, none of those items were paid to my client. So your question is, well, shouldn't that be deducted from the amount, the rent that was actually paid, right, by Mr. Jaime? Asking Justice Carter. The judge deducted rents actually paid, correct? Yes, yes, and in the in the first November 2018 judgment. The 708? Yes. And then there's other components to the damages that lead, that gets to the 917 number, your honor. Is that the claim for rents that unpaid because the plaintiff told the other parties not to pay? That is part of the the other component. So the second component, I think what you're referring to is the additional rents owed by the other tenants. This was an amount approximately, and I'm looking at a little over 200,000. Well, it's 200,000 because the 200,000 number, your honor, includes two things. One is the, are these additional rents that you just discussed, which is around 36,000. The other amount, your honor, are the amounts that were owed under the, under the leases of Mr. Jaime. Because remember, at some point, and this is really a cause of, this litigation lasted, you know, many, many years. So the calculation of $164,429, these were shortages of base rent, additional, additional rent, holdover rent, and late fees that were the result of just, at some point, Mr. Jaime, when this litigation started, he just stopped paying rent altogether and he remained in the property for over two years. Don't, don't quote me on the two years. I don't remember exactly the years, but many years over the course of the litigation. So when you're, when you, when you look at the $164,429 number, that is a combination of $164,000 for Mr. Jaime's businesses, which, because of the September addendum, the liability goes from, you know, because his, his corporations were part of the, where the leases were under his corporation. There was some question as to whether those were him or, or whether they were being paid to him personally. I know Mr. Jaime said that he was dealing strictly with Mr. Nolenboy on an individual basis, but even, even apart from that, the option or the September addendum makes it so a breach of that, of those leases were also a breach of the option agreement, which is an agreement that is with Juan Jaime individually. So that is how the $164,429 is added to that $708,000. Add to that the $36,000 of the additional rents that we are claiming, we claimed at trial that he, he, he told them not to pay and that were, yeah, but that, that was the, that was the $36,000. So that gets you all the way really to the, the $917,000. Does security deposits play a part in that additional rent? The, the security deposits were an amount $7,800 in total. And I know the amounts that were removed because, you know, we asked for $961,750 and we ultimately got $917,000. The amounts that were removed were things that, frankly, this are probably because our evidence was weak for, there was a representation regarding an elevator not working, which all we had was Mr. Nomenboy's testimony regarding that. That was a $35,000 number and then there was damages kind of regarding the security system that was destroyed, which was, which was $10,000. We didn't, we were not able to produce a, an invoice. And so that $35,000 and that $40,000, I'm sorry, $35,000 and the $10,000 were amounts that were not awarded to us, I believe. I have no further questions on my points. Any other questions? No. Okay, Mr. Urban, any rebuttal? Yes, thank you. So the amount charged for Super Marcato of the $92,407, that's unsupported by the record as well, along with all these other numbers. Super Marcato, $76,000 of that $92,000 are charges for the year 2017 and 2018 that they're trying to impose on Super Marcato. Super Marcato's lease expired in 2015. In 2016, Mr. Nomenboy was in court when possession was transferred to Nomenboy. I know of no theory of law that would allow Nomenboy to claim rent and additional rent and holdover rent for the years 2017 and 2018 for Super Marcato. It's on their Exhibit 110A. It shows amounts due, amounts short for 2017, $50,000, amounts short for 2018, $26,000. That's $76,000. So that's not totally against manifest weight of the evidence. It's our position that all these claims for damages are against the manifest weight of the evidence. The additional rents owned by other tenants, that's not the responsibility of Mr. Jaime. None of that reflects additional rent that was not paid in 2014 or 15. It's all in regards to 2016, 17, 18, if you take a look at this. And you have to take into consideration that Mr. Nomenboy overcharged for 2013. He wasn't allowed to do that. There's been no deduction for that. That would mean that Super Marcato owes nothing. For the banquet hall, there was charges for holdover rent and other charges. Holdover rent is a big contention here. The court entered an order early on that said that no lease could be canceled or terminated. So the leases stayed in effect. Mr. Nomenboy did not really want to accept that, so he decided to charge holdover rent under the terms of the lease, which technically, under the law, they were not holdovers because the court basically stopped everything pending the In regards to the leases, I believe that there was no deduction. So in a sense, Mr. Jaime was paying rent, or Mr. Jaime's corporation was paying rent for the banquet hall. And while he was paying rent the entire time up until towards the end, there was no deduction for the amount that Mr. Nomenboy received from these leases that these individuals never paid. So there was about $276,000 that was actually paid to three brothers or Mr. Jaime. And of that, about $200 and some thousand dollars, it's in one of the briefs, as to what was paid to Mr. Nomenboy. So for the time that these tenants were not no longer in the strip center, it's speculative as to what the damages are. There's no support for damages for any of this. The additional rents, or excuse me, the deposits, the options agreement clearly provide that those are not to be turned over until those leases are terminated. Yet, based upon what Nomenboy advised the court, the court found that those were items of misconduct by Jaime by failing to turn over the security deposits. There could have been an order requiring a turnover of those monies, but there should not have been judgment finding that he was guilty of misconduct and not turning them over. When under the terms of the contract, they weren't allowed, there was no need to turn them over until the contract required them. Yet, Mr. Nomenboy continues in the attempt to collect items that they're not entitled to. So it appears from Exhibit 131, which is on the record at C-4686, that of the total, 962 required that the last two items were not granted by the court, but the others were. The items for the what's called the leases, it's speculative. There's nothing in the contract itself that says that what the remedy or penalty is for breach of the non-assignability. There's nothing in the contract. We would argue that that's not, that in accord with the laws of other jurisdictions, that that's not, the remedy is not what the amount that was collected in any event. And I see my time is up. Thank you, Justices. Thank you. We thank both of you for your time. This is a matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess now for a next case.